UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

KATHLEEN BOSTJANCIC,

               Plaintiff,

      -against-

MERRILL LYNCH, PIERCE, FENNER & SMITH
INC. and MERRILL LYNCH & CO., INC.,

               Defendants.

-----------------------------------------------------------X

08 CV 7283

Civ. __
(ECF)

**COMPLAINT**

Plaintiff Demands A
Trial By Jury



Plaintiff, Kathleen Bostjancic ("Bostjancic"), by her attorneys, Liddle &

Robinson, L.L.P., for her Complaint against Merrill Lynch, Pierce, Fenner & Smith Inc.

and Merrill Lynch & Co., Inc. ("Merrill Lynch"), alleges as follows:

## THE PARTIES

1.      Bostjanic is a female residing 12 Stuyvesant Oval, Apartment 6E,

New York, New York 10009.  Bostjancic was employed by Merrill Lynch from July

1999 until May 2, 2008.

2.      Upon information and belief, Merrill Lynch, Pierce, Fenner &

Smith Inc. is a foreign business corporation organized under the laws of Delaware, with a

principal place of business located at 4 World Financial Center, New York, New York

10080.

3.      Upon information and belief, Merrill Lynch & Co., Inc. is a

foreign business corporation organized under the laws of Delaware, with a principal place

of business located at 4 World Financial Center, New York, New York 10080.

## THE NATURE OF THE ACTION

4.      This is a civil action for damages and remedies brought under the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq.; the New York State Executive Law § 296 et seq. ("New York State Human Rights Law"); and the Administrative Code of the City of New York § 8-101 et seq. ("New York City Human Rights Law").

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under 28 U.S.C. § 1331, and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

6.      Bostjancic served copies of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel prior to filing it in this Court.

7.      Venue is proper in this district under 28 U.S.C. § 1391(b) because Merrill Lynch's principal place of business is located in New York and the Southern District of New York is the judicial district in which a substantial part of the evnts giving rise to the claims occurred.

## FACTS

8.      Bostjancic was employed by Defendants Merrill Lynch, Pierce, Fenner & Smith Inc. and Merrill Lynch & Co., Inc. ("Merrill Lynch") from July 1999 until Merrill Lynch terminated her employment. Her last day of work was May 2, 2008.

9.      In 1989, Bostjancic graduated from Rutgers, The State University of New Jersey, with a Bachelor of Arts Degree in Economics.

10. In June 1989, Bostjancic commenced employment with Citicorp Investment Bank ("Citicorp") in its Economics Research Group as a Research Assistant. Bostjancic was employed by Citicorp for six years. Her last position at Citicorp was as an Associate Economist, supporting its Foreign Exchange Desk.

11. During Bostjancic's employment at Citicorp she also pursued a Masters of Arts in Economics from New York University. She graduated with this degree in 1999, upon completion of her thesis.

12. In May 1995, Bostjancic was recruited to Union Bank of Switzerland Securities LLC (U.B.S) as a U.S. Money Market Analyst, specializing in domestic economic issues such as Treasury financing, the Federal Reserve monetary policy operations, fiscal policy and analysis of U.S. economic data. Bostjancic was employed with U.B.S. from June 1995 until July 1998.

13. In July 1999, Bostjancic became employed at Merrill Lynch as a Vice President and Senior United States Economist within the U.S. Economics Research Group. Her starting salary was $100,000. As a Senior United States Economist her duties included directly supporting sales and trading on the Fixed Income trading floor. Her expertise in the U.S. Economics Research Group was in Treasury financing, Federal Reserve monetary policy, domestic fiscal policy and analysis of domestic economic data.

14. Throughout Bostjancic's employment with Merrill Lynch she was qualified for her position and performed her duties in a professional and competent manner.

15.    In 2000, Merrill Lynch found Bostjancic's performance outstanding. Indeed, according to James Winder, then the Manager of Global Economics for Merrill Lynch, the evaluations of her by those with whom she worked were outstanding.

16.    Paul Thomas, President and CEO of the U.S. Treasury and Agency Fixed Income business globally and Barry Wittlin, Head Trader of Interest Rate Swaps and Interest Rate Options, also found Bostjancic's work outstanding.  They stated that her economic and market insights were invaluable.  Mr. Wittlin, ranked #12 on a list of the world's most successful traders for 2004, told Mr. Winder that Bostjancic had contributed significantly to his successful year during 2000.

17.    Based on Bostjancic's strong performance, Mr. Thomas requested that she work more closely with the Fixed Income Trading Desk and asked that she be designated as part of the Fixed Income Government Securities Inc. (GSI) headcount. Bostjancic became the Fixed Income Trading Desk Economist.  In January 2001, she began directly reporting to Mr. Thomas.  In 2002, Mr. Thomas and Mr. Wittlin were promoted to Co-Heads of Merrill Lynch's Global Fixed Income Rates Division and at that time Bostjancic began reporting to both Mr. Wittlin and Mr. Thomas.

18.    In early 2003, Merrill Lynch named David Rosenberg the Chief North American Economist.  Upon Mr. Rosenberg's hire, Bostjancic began dual reporting to Mr. Rosenberg and Messrs. Thomas and Wittlin.  In mid-2003, Bostjancic began to report solely to Mr. Rosenberg.

19.    In mid-2003, Mr. Rosenberg found Bostjancic's performance outstanding.  In her mid-year Performance Review, Mr. Rosenberg stated that "Kathy continues to deliver top-caliber product, both written and verbal.  Her written work rarely

4

needs to be amended or revised. She is a great team player and a good mentor for the junior

staff. . . . Her judgment is impeccable."

20.    In early 2004, Mr. Rosenberg promoted Bostjancic to second-most

senior economist within the Economics Group in addition to her responsibilities as the Fixed

Income Trading Desk Economist. As Mr. Rosenberg's second in command, Bostjancic's

responsibilities grew drastically.

21.    In 2004, Mr. Rosenberg rated Bostjancic's performance the highest

possible rating: "Achieved with Distinction." He stated in her Performance Review that:

"Kathy has proven to be a reliable, trusting and valuable right hand member of the team.

She has taken on added responsibilities this past year in terms of managing the group when I

am away. Kathy continues to run the schedule for the plethora of morning meetings we do

on a daily basis. She remains heavily involved in the day-to-day running of the group. Her

business travel has picked up as have the number of presentations. Kathy has also been

successful in branching out beyond fixed income and towards equity and private clients.

Her research skills are impeccable and her teammates look to her for guidance on a regular

basis."

22.    In 2005, Mr. Rosenberg rated Bostjancic's overall performance

rating a 4 — "Outstanding Performer." Mr. Rosenberg stated:

> Kathy's profile continued to rise this year, especially with
> institutional Equity and Private Client divisions of ML. Kathy gave
> numerous speeches, including extensive travel, and all were very
> well-received. She participates at many ML functions and is actively
> involved in training sessions for junior bond traders.
>
> Kathy's contributions to the flagship Market Economist publication
> was of high quality and covered a broad array of topics, with her
> work on Social Security reform a notable report. Her continued
> work on forecasting Treasury borrowings and her stepped-up

responsibilities of coordinating the Interest Rate Committee meetings are worth noting as well as important contributions. Kathy meets regularly with Treasury and Fed officials, has received good press coverage (including CNBC), conducts many of the morning bond meetings, and has continued to support the fixed income desk in her key role as desk economist.

Kathy has assisted David Rosenberg, especially during his marketing trips, to manage the department; and she has done a good job mentoring Tom Porcelli as well as helping handle other staff issues. Kathy has proven to be a very solid #2 to David Rosenberg.

Areas of focus for Kathy in 2006 will be to continue to reach out to the equity desk, come up more frequently with creative "out of the box" macro themes and bolster her II votes in fixed income. Congratulations, Kathy, on another very good year.

23.     Along with the outstanding performance evaluations and assumption of additional responsibility, Merrill Lynch steadily increased Bostjancic's compensation. In 2003, her compensation was increased from $190,000 to $300,000 (of this amount, $125,000 was in base salary and $175,000 was a bonus). In 2004, it rose to $400,000 (of this amount, $150,000 was in base salary and $250,000 was a bonus). In 2005, it rose to $600,000 (of this amount, $150,000 was in base salary and $450,000 was a bonus). In 2006, her total compensation was $650,000 (of this amount, $150,000 was in base salary and $500,000 was a bonus).

24.     In November 2005, Bostjancic notified Mr. Rosenberg that she was pregnant. During the last week of June 2006 she began her maternity leave. On July 4, 2006, she gave birth to her son.

25.     From the time Bostjancic began working for Mr. Rosenberg until she notified him that she had become pregnant, he applauded her performance. After she notified Mr. Rosenberg that she was pregnant she continued to perform at the same high-

level as she had previously performed. After Bostjancic notified him of her pregnancy, Mr. Rosenberg's attitude toward her changed. Mr. Rosenberg marginalized and undermined Bostjancic.

26.    While Bostjancic was on maternity leave, Mr. Rosenberg hired a single man to assume a large portion of her job duties going forward, including after she returned from maternity leave. On her maternity leave during the last week of August 2006, Mr. Rosenberg called her and informed her that he intended to hire John Herrman, the ex-Chief Economist from Cantor Fitzgerald, as another senior economist in their group who would service the Fixed Income Desk. In other words, he intended to hire John Herrman to perform a significant portion of Bostjancic's job.

27.    Mr. Rosenberg explained that he wanted Bostjancic to take on a comparable role as a "Washington Policy Analyst" and develop her own research product. It did not become apparent to Bostjancic until her return from maternity leave that this role was a lesser position than her previous position servicing the Fixed Income Desk. The role involved less responsibility and visibility within the firm.

28.    Bostjancic ended her maternity leave in mid-October 2006. Upon her return, Mr. Rosenberg asked her to prepare the business plan for her new position and to present the plan to the New Product Committee, which she did. Within ten minutes of her presentation, Candace Browning, the Global Head of Research and Mr. Rosenberg's direct manager, rejected the business plan. She said that Merrill Lynch did not want to foray so deeply into political issues. Mr. Rosenberg had not previously explained to Bostjancic that he (1) had not previously discussed or obtained approval for a Washington Policy Analyst position from the New Product Committee or Candace Browning; (2) intended for it to be

her responsibility to obtain approval from the New Product Committee for the new role he had transferred her to; and (3) that he did not have authority to offer her this new role when he took her role of supporting the Fixed Income Desk away from her and gave it to John Herrman during her maternity leave.

29.    Mr. Rosenberg's action in giving Bostjancic's Fixed Income Desk responsibilities to John Herrman while she was on maternity leave and his failure to provide her either a comparable or a defined role upon her return from maternity leave significantly reduced Bostjancic's role and standing within the U.S. Economics Group and derailed her career at Merrill Lynch.

30.    In late October 2006, Bostjancic requested that Merrill Lynch allow her to work from home in the morning in order to breastfeed her son from home. Merrill Lynch agreed. They executed a "Letter of Understanding Regarding Flexible & Remote Work Arrangement" (the "Letter of Understanding") which provided, among other things, that:

- "You will work from your home each morning from 7:30 AM to approximately 12:00 PM";

- "[You will be at work in the NY World Financial Center Office by 12:15 PM each day" and "[would] work in the office until 4:45 PM each day unless travel for work [was] necessary"; and

- "We expect the arrangement to be in place for approximately 6 months, at the end of which we will re-assess the arrangement and the option of extending for another six months."

31.    Shortly after entering into the Letter of Understanding, Mr. Rosenberg began a campaign to challenge the effectiveness of Bostjancic's Remote Work Arrangement. It came to her attention that he asked his administrative assistant to secretly maintain a log, which recorded instances where Bostjancic allegedly failed to say hello to a co-worker, or kept the door to her office closed or asked not to be interrupted in her office for fifteen-minute periods. At the time, Bostjancic thought it was quite odd that Mr. Rosenberg was creating such a log rather than simply asking her directly why on occasion her door was closed or she did not want visitors in her office. Had he done so, she would have explained that she closed her door and discouraged visitors because she was breast-pumping milk. Bostjancic pumped milk in her office since it was more efficient then taking time out to walk down to the lactation room that Merrill Lynch provided. Moreover, she was still able to accomplish work during these intervals albeit with the door closed in the privacy of her office.

32.    Mr. Rosenberg also began to question in a log the time Bostjancic arrived at the office and left the office. As a professional, her work ethic had never previously been called into question and unfortunately the log did not account for the numerous occasions on which she worked during the evenings or on the weekends.

33.    As for Mr. Rosenberg recording when she arrived at the office, there were times when Bostjancic arrived in the office later than 12:15 p.m., due to work responsibilities such as speaking with clients or other Merrill Lynch colleagues or working to meet a deadline. Bostjancic was always reachable during these times by e-mail or phone and would most times notify others to alert them of her later arrival time. In Bostjancic's

nine months of working from home she never received one complaint from Mr. Rosenberg about her arrival time.

34.    In December 2006, Mr. Rosenberg prepared a review of Bostjancic's performance for the year 2006. She received a reduced rating of 3 as compared to the rating of 4 from the prior year. In the review, the only concerns he pointed to in order to justify a lower performance rating was (1) his questioning of her performance in garnering support from the Fixed Income Desk, and (2) the rate of development of new charts and macro themes. The frustration of the Fixed Income Desk with the U.S. Economics Group's data interpretation was unfortunately a result of a series of predictions about the direction of the U.S. economy that were not borne out. The analyses were prepared and promoted by Mr. Rosenberg as the Chief Economist of the U.S. Economics Group. The Fixed Income group's frustration was therefore not a function of Bostjancic's performance. Although she presented Mr. Rosenberg with new macro economic ideas and charts, he elected to reject most of them, a practice which he did not engage in prior to her taking maternity leave.

35.    In April 2007, Bostjancic met with Mr. Rosenberg and Scott Grubin, the Head of Client Human Resources. During the meeting Mr. Rosenberg expressed discomfort with her Remote Work arrangement. Bostjancic asked Mr. Rosenberg if he had any specific issues or felt that the arrangement was not working. Mr. Rosenberg agreed "it [was] working and [he] [had] no specific complaints." In an attempt to alleviate Mr. Rosenberg's concerns, Bostjancic said she would stop working from home at the end of June. He immediately expressed relief upon hearing this.

36.    On September 7, 2007, shortly after she returned from vacation, Mr. Rosenberg held a meeting with Bostjancic in which he told her, without any evidence, that

her performance had slipped.   Mr. Rosenberg also told Bostjancic that she needed to dedicate more hours to the job, including working on the weekends, holidays, and vacations. During this meeting he also gave her a formal memorandum that stated:

"As I mentioned, I have been disappointed with your performance in the following areas:

- I expect you to be proactive in both client contact and idea generation.

- Quality of work needs to improve dramatically.  As I mentioned, your LIBOR piece required my revising it twice before it was ready for publication.  As a senior economist, this is unacceptable.

- I expect you as a senior economist on the team to actively seek me out rather than my pursuing you for status reports or publication ideas."

These allegations are without merit.

37.    The statements Mr. Rosenberg made during the meetings and in the memorandum are not borne out by the facts.  First, Bostjancic did already frequently work on weekends and answered e-mails Mr. Rosenberg would send her on weekends and during vacations and made phone calls to check in with the economic team when on vacation. Second, Bostjancic regularly presented Mr. Rosenberg with macro economic ideas and topics.  Prior to her becoming pregnant, he generally accepted her topic proposals.  After she returned to work from maternity leave, he would reject Bostjancic's topic proposals and ideas.  Bostjancic does not believe there was any difference in the quality of the topics and ideas that she presented after she returned to work compared with her prior proposals. Third, Bostjancic had continued to meet and speak with a heavy roster of clients from the

institutional and private client side of the business on both the fixed income and equity side of the business. This was despite Mr. Rosenberg removing her from the trading floor role, which meant she no longer participated in impromptu discussions with top clients, in particular following the release of key data or Federal Reserve monetary policy announcements or speeches. Fourth, the quality of her writing did not change, but rather Mr. Rosenberg adopted a critical approach of her writing. Indeed, Bostjancic received honorable mention within Merrill Lynch in October 2007 and March 2008 for the quality of her analysis and writing when her work was designated as one of the firm's "Reports of the Month." Fifth, as she had done in the past, Bostjancic always reached out to Mr. Rosenberg with status reports on the team and the publications. Without fail, she kept the economics team running on a tight schedule and they never missed a publishing deadline.

38. Nonetheless, Bostjancic attempted to address Mr. Rosenberg's concerns after she received the memorandum. She increased her workday and worked more hours on the weekends.

39. Mr. Rosenberg led Bostjancic to believe that he was pleased with her increased effort and quality of work in the last months of 2007.

40. In mid-December 2007, when Mr. Rosenberg delivered Bostjancic's year-end review for 2007, he gave her the lowest rating she had received during her entire career on Wall Street. He rated her performance to be an "inconsistent performer." He rated Bostjancic a "2" on a scale of 1 to 5, with 1 being the worst. In the performance review, Mr. Rosenberg claimed that Bostjancic's writing was no longer consistent and that her team leadership abilities were lacking. He also told her that her contribution to a work-

life balance committee she was asked to participate in was not an accomplishment and that she had "insult[ed] [his] intelligence" to list it as one of her year-end accomplishments.

41.    In 2007, Mr. Rosenberg underpaid Bostjancic because of her gender and status as a mother returning to the workplace.  Her total compensation was reduced from $650,000 the prior year to $400,000 (of this amount, $150,000 was in base salary and $250,000 was a bonus).

42.    The poor review constituted discriminatory treatment and was not consistent with other individual's evaluations of her performance.  In 2006, her cross evaluations were strong and she was rated a 4.43 on a 5 point scale which is generally considered a strong rating.  In 2007, her cross evaluations were again strong and her ratings were virtually equivalent.  Bostjancic's rating in the cross-evaluations was a 4.24, again generally considered a strong rating and most significant — the ratings were virtually the same as the prior year.  Her performance, therefore, in the eyes of other colleagues remained consistent between 2006 and 2007.

43.    At the same time, Mr. Rosenberg's cross-evaluations for 2007 were very poor and revealed how poorly members of the team rated him as a manager. As a result of his cross-evaluations, Mr. Rosenberg was mandated to attend a two-day management training session as a result of his poor management skills.

44.    At Bostjancic's year-end review, Mr. Rosenberg told her "I do not know your home environment, but the bottom-line is I run a business here ... I have an agreement with [my wife] and she knows how I am.  You may want to discuss some arrangement with [your husband]."

13

45.    When Bostjancic took issue with Mr. Rosenberg's comments on her performance review, he told her that she was acting unduly defensive and became angry with her.

46.    Two months later, in mid-February, 2008, Mr. Rosenberg told her that she was off to a great start for the year.

47.    On April 28, 2008, Mr. Rosenberg notified Bostjancic that her employment was terminated. Her last day of work was May 2, 2008. The reason given for her termination was that she was part of a Reduction In Force ("RIF"). Upon information and belief, the reason Merrill Lynch gave for terminating her employment was a pretext for discrimination. Subsequent to her dismissal, Mr. Rosenberg hired another senior economist, Drew Matus from Lehman Brothers, who has taken over her role and responsibilities in the group.

48.    Upon information and belief, a determining factor in the discriminatory decision by Merrill Lynch to terminate Bostjancic's employment was the consistent diminishment of her role and responsibilities and her marginalization in the U.S. Economics Group after she became pregnant and returned to work as a mother, followed by the creation of an inaccurate portrayal of her performance to justify the continued diminishment in her role culminating with the discriminatory termination of her employment.

49.    This is not the first time that Mr. Rosenberg has engaged in questionable conduct in his management of female employees. His current and former administrative assistants have lodged allegations of harassment against him. Merrill Lynch had to transfer one of his administrative assistants in connection with his conduct. In

addition, in 2006, Merrill Lynch had identified Ms. Lokody, a junior economist in the U.S. Economics Group, as a rising star. In 2006, Ms. Lokody was rated the top junior economist on the staff. After Ms. Lokody became engaged, requested to move back to Canada, and subsequently married, Mr. Rosenberg began to dramatically treat her differently by becoming highly critical of the work she prepared for the North American Morning Market Memo that was distributed internally and to clients and demanded a lot more hours of work from her. This treatment was not based upon any change in Ms. Lokody's performance or commitment to the job. Based on Mr. Rosenberg's growing disfavor with Ms. Lokody, she felt compelled to resign her employment and left Merrill Lynch in early 2008.

50.     Similarly, Mr. Rosenberg hired John Herrman a single man without any children to take on Bostjancic's Fixed Income Desk responsibilities.

## FIRST CLAIM
### (Violation of the Family and Medical Leave Act)

51.     Bostjancic repeats and realleges the allegations contained in paragraphs 1 through 50, as if separately set forth herein.

52.     Plaintiff is a female citizen of the United States and was an "employee" of defendant within the meaning of 29 U.S.C.A. § 2611(2)(A) at all times relevant to this action.

53.     Defendants are an "employer" within the meaning of 29 U.S.C.A. § 2611(4)(A) at all times relevant to this action.

54.     Plaintiff timely requested a medical leave from Defendants permitted under the Family and Medical leave Act ("FMLA").

55.    During the last week of June 2006, Plaintiff commenced a medical leave due to the birth of her son.

56.    During her leave, Defendants changed Plaintiff's duties and responsibilities from the position of employment she held when her leave commenced.

57.    Defendants failed to restore Plaintiff to an equivalent position with equivalent terms and conditions of employment.

58.    Defendants also treated Plaintiff adversely because she took the leave of absence she was entitled to under the FMLA.

59.    Defendants discriminated and retaliated against Plaintiff because she took a FMLA leave of absence.

60.    As a proximate result of Defendants' discrimination against Plaintiff on the basis of her exercise of rights under the FMLA, Plaintiff has suffered and continues to suffer substantial losses, including back pay and front pay or reinstatement, and other employment benefits.

61.    As a result of Defendants' unlawful conduct, they are also liable for liquidated damages, interest, and attorneys' fees and costs.


## SECOND CLAIM
### (Sex and Pregnancy Discrimination Under the New York State Human Rights Law)


62.    Bostjancic repeats and realleges the allegations contained in paragraphs 1 through 61, as if separately set forth herein.

63.    At all relevant times, Bostjancic was an "employee" for purposes of § 296 of the New York State Human Rights Law.

16

64.    Defendants are an "employer" for purposes of § 292 of the New York State Human Rights Law.

65.    By its actions detailed above, Defendants have unlawfully discriminated against Bostjancic on the basis of her sex, pregnancy and childbirth, in violation of the New York State Human Rights law.

66.    Upon information and belief, Defendants' conduct towards Bostjancic constitutes willful discrimination.

67.    As a result of Defendants' unlawful conduct, Bostjancic has suffered and continues to suffer substantial damages, including loss of back pay, front pay or reintstatement, other employment benefits, emotional pain and mental anguish, in an amount as yet undetermined.

68.    As a result of Defendants' unlawful conduct, they are also liable for attorneys' fees and costs.

### THIRD CLAIM
**(Sex and Pregnancy Discrimination Under the New York City Human Rights Law)**

69.    Bostjancic repeats and realleges the allegations contained in paragraphs 1 through 68 as if separately set forth herein.

70.    Bostjancic is a "person" under § 8-102(1) of the New York City Human Rights Law.

71.    Defendants are an "employer" subject to the provisions of the New York City Human Rights Law under § 8-102(5) of the Administrative Code.

72.    By its actions detailed above, Defendants have unlawfully discriminated against Bostjancic on the basis of her sex, pregnancy and childbirth, in violation of the New York City Human Rights Law.

73.    As a result of Defendants' unlawful conduct, Bostjancic has suffered and continues to suffer substantial damages, including loss of back pay and front pay ore reinstatement, and other employment benefits, in an amount as yet undetermined.

74.    As a result of Defendants' unlawful conduct, they are also liable for punitive damages and attorneys' fees and costs.

75.    Upon information and belief, Defendants' discriminatory conduct was taken with reckless indifference to Plaintiff's rights, entitling her to punitive damages under the New York City Human Rights Law.

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    On the First Claim, back pay and front pay, bonuses, and other employment benefits, liquidated damages, interest, and attorneys' fees and costs;

B.    On the Second Claim, back pay and front pay or reinstatement, bonuses, other employment benefits, plus compensatory damages to the maximum extent allowable by law, and attorneys' fees, costs, and interest;

C.    On the Third Claim, back pay and benefits and front pay or reinstatement and benefits in an amount as yet undetermined, plus compensatory damages and punitive damages to the maximum extent allowable by law, attorneys' fees, costs and interest; and

D.    Such other and further relief as the Court deems appropriate under

the circumstances.


Dated:        New York, New York
              August 15, 2008


                              LIDDLE & ROBINSON, L.L.P.

                              By: _Marc A. Susswein_____

                                   Marc A. Susswein
                                   Andrea M. Paparella
                              800 Third Avenue
                              New York, New York 10022
                              (212) 687-8500
                              msusswein@liddlerobinson.com
                              apaparella@liddlerobinson.com


                              Attorneys for Plaintiff


19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ x

KATHLEEN BOSTJANCIC,                                    :
                                                        :
                    Plaintiff,                          :
                                                        :
        -against-                                       :        AFFIDAVIT OF SERVICE
                                                        :              BY HAND
MERRILL LYNCH, PIERCE, FENNER &                         :
SMITH INC. and MERRILL LYNCH & CO.,                     :
INC.,                                                   :
                                                        :
                    Defendants.                         :

------------------------------------------------------ x

**Chris Anduha,** being duly sworn deposes and says:

1. I am not a party to the above referenced action, am over 18 years of age, and reside at 772 Richmond Terrace, Staten Island, NY 10301.

2. On August 15, 2008, I personally served the **COMPLAINT** on the following:

CORPOARTION COUNSEL                      NEW YORK CITY COMMISSION
NEW YORK CITY                            ON HUMAN RIGHTS
100 Church Street, Room 4313             40 Rector Street, 9th Floor
New York, New York 10007                 New York, New York 10006

                                         _____
                                                    Chris Anduha

Sworn to before me this
15th day of August, 2008.

_____
        NOTARY PUBLIC

                KAREN HETZ
        Notary Public, State of New York
                No. 01HE4632920
            Qualified in Richmond County
        Commission Expires July 31, 2010